## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

DEBRA ANN LUTTRELL,      )
                                  )

           Plaintiff,       )
                                  )

vs.                          )     Case No. 08-cv-357-TLW
                                  )

MICHAEL J. ASTRUE,        )
Commissioner of the Social Security    )
Administration,              )
                                  )

           Defendant.    )

## OPINION AND ORDER

Plaintiff Debra Ann Luttrell, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c),

requests judicial review of the decision of the Commissioner of the Social Security

Administration denying plaintiff's applications for disability benefits and supplemental security

benefits ("SSI") under Titles II and XVI of the Social Security Act ("Act").  In accordance with

28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before the undersigned

United States Magistrate Judge.  (Dkt. # 11).  Any appeal of this order will be directly to the

Tenth Circuit Court of Appeals.

## Plaintiff's Background

Plaintiff was born February 2, 1959 and was 49 years old at the time of the

Administrative Law Judge's ("ALJ") final decision on January 23, 2008.[1]  (R. 51).  Plaintiff

completed twelfth grade in high school and had no additional training or education.  (R. 106,

---

[1] Plaintiff's applications for disability and SSI were denied initially and upon reconsideration. (R. 26, 44-47, 27, 40-42, 235, 236-239, 240, 241-243).  A hearing before ALJ Gene M. Kelly was held August 21, 2007, in Tulsa, Oklahoma.  (R. 333-378).  By decision dated January 23, 2008, the ALJ found that plaintiff was not disabled at any time through the date of the decision. (R. 11-24).  On April 24, 2008, the Appeals Council denied review of the ALJ's findings. (R. 5-7).  Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal.  20 C.F.R. §§ 404.981, 416.1481.

339).  Plaintiff's prior work history includes a line person at a bakery (1988-1990); a maid (self-employed) at a motel (1994-1995); and a claims manager at Wal-Mart (1999-2005).  (R. 70-86; 339-340).  Plaintiff quit her job as claims manager at Wal-Mart on March 17, 2005, the date on which she alleges she became unable to work.  Plaintiff was involved in a motor vehicle accident in 2001, in which she suffered a lower back injury.  (R. 118).  She underwent a L5-S1 microdiscectomy on December 29, 2003 to free the nerve that was affected by the herniated disk she suffered.  (R. 115-117).  After surgery, plaintiff was able to return to work, but stated she was not able to perform her job at the required level due to her level of pain, so she quit.  (R. 125).  Plaintiff stated that she cares for her husband, performing "regular chores" for him and also cares for a pet, by "feed[ing], water[ing], walk[ing] and play[ing] with him."[2]  (R. 59).  She cooks "simple dinners" daily and states she is still able to perform all household chores (both indoor and out).  (R. 60).  She claims she only needs assistance with the laundry basket.  Id.  Plaintiff stated her prior hobbies were fishing, boating, sewing, reading and gardening, but she cannot sit long enough without pain to enjoy these activities anymore.  (R. 62).  Plaintiff is married to Lonnie Luttrell and has no children under eighteen living at home.  (R. 52).  There is no history of drug or alcoholism with either plaintiff or her family.  (R. 125, 187).

At an examination at Grand Lake Mental Health Center, Inc., plaintiff stated that due to her physical pain, she was unable to engage in sexual intimacy with her husband, which led to his participation in an extramarital affair.  (R. 185).  Plaintiff stated she and her husband separated and she currently resided with her mother-in-law, who was supportive of her efforts to

---

[2]  Plaintiff does not say what type of animal her pet is, although she mentioned using a cane to walk to the stable at the hearing.  (R. 357).

receive help in therapy.  (R. 186).  Plaintiff testified that the situation with her marriage has left her "emotionally devastated."  (R. 187).

Plaintiff protectively filed applications for disability and SSI on June 3, 2005, claiming a disability onset date of March 17, 2005.  (R. 52-54, 232-234).  She claimed the conditions that limit her ability to work are "back injury/surgery/nerve damage in right leg."  (R. 102).

At the hearing, the ALJ questioned plaintiff regarding what she felt her most important issues were that affected her ability to work, stating he had made a "list of things [he] th[ought] would have an impact on [her] ability to work."  (R. 341).  Plaintiff mentioned losing her concentration due to pain, headaches, leg pain, her arm going numb, and back pain.  Id.  The ALJ then asked about problems with her ears, and plaintiff explained her problems with her right ear. (R. 342).  The ALJ then questioned her about kidney stones, her ribs, and requested more detail about the discussed conditions.  (R. 343-347).  He brought up temperatures and the effect any weather may have on plaintiff.  (R. 347).  He then questioned her about her depression, which she claimed also limited her ability to work.  (R. 348-349).  She explained to the ALJ that she felt her depression had "tak[en] over control of [her]," and she was unable to concentrate.  (R. 348).   Expounding on the ALJ's questions, plaintiff's attorney also questioned her about depression and the problems she felt it caused.  (R. 353-354).  Plaintiff mentioned treating her depression by taking pills every night before bed, and explained she was no longer able to attend therapy sessions at Grand Lake Mental Health due to her mother-in-law's limited funds with which to travel.  (R. 353).  She elaborated that concentration was a major problem in performing her job duties at Wal-Mart and lead to several mistakes.  (R. 354).  Plaintiff stated she is unable to leave her home approximately nine (9) days each month due to anxiety.  (R. 358).

Plaintiff spoke of her issues with pain, stating to both the ALJ and her attorney that she used exercise, steroid shots, heating pads, ice compresses, Bengay® and a vibrating chair pad as methods of dealing with the pain caused by her injuries.  (R. 349-356).  Plaintiff discussed slight weight gain, and some sleep problems (waking during the night).  (R. 351-352).  The ALJ questioned plaintiff regarding how long she could sit, stand, walk, and the most weight she was able to lift.  Plaintiff testified she was able to stand for "about an hour," sit for the same amount of time, walk "close to a block maybe," and lift a ten pound bag of sugar.  (R. 352).

Plaintiff explained being unable to function with a "worse headache," and the effects of the pain she feels.  (R. 355).  She stated she walks on uneven surfaces (such as outdoors) with a cane.  (R. 356-357).  She stated she has balance problems and is able to do the household chores she listed to the ALJ every day, but not at the same level as before her accident.  (R. 357).

## Medical History

Treating Physicians

The first medical records in plaintiff's file are from Vail Valley Medical Center, which begin with reports of MRIs on July 31, 2003, and end detailing plaintiff's back surgery (microdiscectomy) on December 29, 2003.  (R. 112-124).  These records detail plaintiff's journey through treatment for chronic low back pain, brought about by an automobile accident in 2001.  (R. 118).  Plaintiff first presented to Donald Corenman, M.D. on May 20, 2003 stating she had undergone conservative treatment of eight to ten epidural steroid injections, and four months of physical therapy under the direction of Dr. Colliton.[3]  Id.  Dr. Corenman went on to explain

---

[3]  Dr. Corenman stated plaintiff was referred to Vail by her primary care physician, a "Dr. Callen," yet no additional records are located within the transcript from Dr. Callen.  (R. 118). There are also no detailed records of plaintiff's treatment under Dr. Colliton.

plaintiff's x-rays, taken on the date of this exam, showed no evidence of scoliosis, a "relatively flat lumbar spine" with normal lumbar lordosis, no evidence of spondylolysis (a stress fracture in one of the vertebrae) or spondylolisthesis (the weakened vertebrae is unable to maintain its position and begins to shift out of place).  (R. 119-120).  He went on to detail plaintiff's MRI of the lumbar spine taken December 21, 2001 at Vail Valley Medical Center, noting degenerative disk disease at L5-S1 with a posterior disk herniation and noted mildly degenerative disks at L3-L4 and L4-L5, with herniation more on the left than the right, and an anular tear on the L3-L4 bulge.  (R. 120).  Dr. Corenman summarized his impressions of plaintiff and her complaints, noting the left sided herniation of the above noted disks did not fully explain her right sided back and leg pain.  He stated plaintiff suffered from "reactive depression" due to chronic pain and "a separation from her husband of 13 years."  Id.  He indicated plaintiff had some symptom magnification, but since she was working full time at the time, he stated he believed that to be a minor point that did not affect her current complaints.  In an attempt to curb plaintiff's reactive depression, Dr. Corenman prescribed Zoloft (depression medication) and discussed the side effects with her.  Id.

Next, plaintiff's records with Vail jump ahead to her surgery on December 29, 2003.  (R. 113-117).  Her diagnosis before surgery was "L5-S1 degenerative disk disease with herniation, broad based."  A L5-S1 microdiscectomy was performed, the nerve was freed from adhesions, and the herniated disk was cleaned out, "decompressing the posterior disk significantly."  (R. 116).  Plaintiff returned to work with regular duties and continued working until March 17, 2005, her alleged onset date.  (R. 125).

Plaintiff has a significant gap in her treating medical records after Vail Medical Center.  She was seen at Grand Lake Mental Health Center between May 30, 2006 and November 1,

2006 for depression.   (R. 170-191).   On May 30, 2006, plaintiff initially met with Sidney Pilkinton, LCSW, who noted her depressed state, denial of suicidal ideations, hallucinations and substance abuse.  She scheduled an intake appointment for plaintiff on June 14, 2006 to begin mental health services.  (R. 191).  Plaintiff was assessed June 13, 2006 by Theresa Page-Bohannan, MS/LPC.  (R. 185-189).  Ms. Bohannan noted plaintiff had been prescribed Prozac on June 1, 2006 for depression, with no notable improvement yet.

Upon intake, plaintiff was given an Axis rating of I-Dysthymic disorder,[4] II-no diagnosis, III-Osteoarthritis, nerve damage in right leg, twisted spine, and hysterectomy (all by patient report), IV-primary support group, social environment, access to health care, economic and occupational, and V-GAF score of 41 (highest in past year-45).

Plaintiff's treatment records at Grand Lake reflect progress in resolving her depression and anxiety.   (R. 170-176).   Plaintiff consistently stated she was taking all prescribed medications "religiously," but the Prozac was not helping her moods, so she was changed to Lexapro (anti-depressant), Vistaril (for anxiety and allergies), and Lunesta (to treat insomnia). (R. 173, 174).  Rose Surratt, BSW, BHRS stated in her notes of each visit that plaintiff's "affect was broad."[5]  (R. 171, 172, 174).  Plaintiff stated she was "having no major problems."  (R. 172, 174).  On a visit to the clinician for medication evaluation, Shirley Chesnut, D.O. noted plaintiff had "[n]o complaint of depression or suicidal/homicidal ideation."  (R. 170).  Plaintiff was told she would notice an improvement from her new medications when her ear infection cleared up. (R. 171).

---

[4]  Dysthymic disorder is a chronic condition defined by depressive symptoms lasting most of the day, more days than not, for at least two years.  See www.mentalhealth.com/dis/p20-md04.html.

[5]  "Broad affect" is considered to be a "normal" range of affect.  See www.encyclopedia.com/doc/ 1G2-3405700018.html.

The record shows she next visited Christian Medical Clinic of Grand Lake June 1, 2006, apparently seeing at least four different doctors between June 1, 2006 and April 26, 2007.  (R. 157-160, 195-198).  Plaintiff's major complaints were depression, back pain despite her 2003 surgery, severe headaches, ear aches, and her legs going numb.  (R. 158-159).  Plaintiff was prescribed medications and exercise.  (R. 158).  She had a CT scan of the lumbar spine performed October 11, 2006, and the impression was "mild degenerative disk changes of the lower lumbar spine; no large disk protrusion or severe acquired spinal stenosis,[6] no focal bony abnormality."  (R. 168).  Plaintiff told her doctor on April 19, 2007 that she had no transportation and could not get her medication, so had not been taking her Prozac since February.  (R. 198).

On January 9, 2007, plaintiff visited Richard Allen, D.O., on referral from Dr. Bland at Christian Medical Clinic (R. 193) for a chronic ear infection and ear ache.  (R. 192-194).  He determined her pain was caused by TMJ disorder[7] and worn dentures, and advised plaintiff to get new dentures.  (R. 192, 193).  Plaintiff showed only mild hearing loss in a hearing test.  (R. 194).

Consultative Exams

Plaintiff's first consultative examination was performed by Mohammed Quadeer, M.D. on August 16, 2005.  (R. 125-132).  Dr. Quadeer noted plaintiff had no clubbing or tenderness in her extremities, that plaintiff's grip strength was 5/5, bilaterally strong and firm.  He noted plaintiff was able to perform fine and gross manipulation with her hands.  (R. 127).  There was full range of motion in her knees with no edema or effusion.  Her legs were equal in length bilaterally.  Id.  Plaintiff's cervical and thoratic-lumbar spines were noted to have full range of

---

[6] Spinal stenosis occurs when the spinal canal is narrowed or compromised, leaving inadequate room for the nerves.  See www.healthcentral.com/encyclopedia/408/216.html.

[7] Temporomandibular joint disorder is characterized by pain in the jaw and surrounding tissues and limitations in jaw movements.  See www.tmj.org/basics.asp.

motion "in all planes."  Id.  The lumbar-sacral spine was noted as tender with limited range of motion in all planes associated with pain and muscle spasms on the right side.  A straight leg raising "reflex" was negative bilaterally both sitting and lying down.  Id.  All neurological tests performed were normal.  Plaintiff's remote and recent memories were found to be intact, and her thought processes appeared normal.  Dr. Quadeer noted plaintiff "appear[ed] to have anxiety and depression."  Id.  He noted plaintiff's gait was "safe and stable with appropriate speed," that she did not use any assistive devices to walk.  Dr. Quadeer also noted her heel/toe walking was weak, but no identifiable muscle atrophy was seen.  Id.

Next, on September 16, 2005, a psychiatric residual functional capacity ("RFC") form was filled out for plaintiff by Laura Lochner, Ph.D., based on the record.  (R. 133-146).  Plaintiff's impairments based on the 12.04 (Affective Disorders-Depression) and 12.06 (Anxiety-Related Disorders) were rated "not severe."  (R. 133).  Plaintiff was given a rating of no limitations in activities of daily living ("ADL"), maintaining social functioning, maintaining concentration, persistence or pace, and Dr. Lochner found no episodes of decompensation.  (R. 143).  In her discussion, Dr. Lochner mentioned no recent medical records or prescription medications, and that claimant claimed her ADLs were limited only by her alleged pain level.  (R. 145).  She also noted Dr. Quadeer's diagnosis of anxiety and depression, but noted Dr. Quadeer's examination of plaintiff did not show any significant problems with depression.  Dr. Quadeer noted plaintiff only used ibuprofen to control her pain.  Dr. Lochner noted Dr. Quadeer stated plaintiff denied mood swings, delusions or hallucinations, her thought process appeared normal, the neurologic and mental status portions of Dr. Quadeer's examination were also normal.  Id.  Plaintiff's remote memory and recent memory were both intact.  Dr. Lochner

concluded that because the findings of anxiety and depression were noted by Dr. Quadeer, the Commissioner determined they were not severe.  Id.

Next, Bob Dodd, M.D. completed a physical RFC form for plaintiff on March 21, 2006. (R. 149-156).  Dr. Dodd reviewed the record and decided plaintiff was able to perform medium work.  Dr. Dodd's RFC showed he believed plaintiff was able to occasionally lift and/or carry a maximum of 50 pounds, frequently lift and/or carry 25 pounds, stand or walk for six hours in an eight hour day, sit for six hours in an eight hour day, and no limitations were given on pushing or pulling hand and foot controls.  (R. 150).  He noted plaintiff should be able to frequently climb stairs, and ladders, stoop, kneel, crouch and crawl.  The only limitation placed on plaintiff was that she was limited to occasionally balancing.  (R. 151).  There were no visual, manipulative, communicative, or environmental limitations placed on plaintiff.  (R. 153-154).

On August 9, 2007, Richard Tidwell, M.D. completed a "Residual Functional Capacity to do Work Related Activities" form for plaintiff.  Dr. Tidwell is not an agency physician, he treated plaintiff at Christian Medical Center, apparently one time, on July 20, 2006.  He rated plaintiff as being able to sit for ten to thirty minutes for only one hour at a time, stand ten to thirty minutes two hours at a time, and walk ten to thirty minutes two hours at a time, the same rating was given in regard to the entire eight hour workday.  (R. 200).  Dr. Tidwell stated plaintiff was limited to occasionally lifting or carrying up to 20 pounds only, and that she was limited in her ability to use her feet and hands for repetitive movements, but only on the right side.  (R. 201).  Dr. Tidwell also rated plaintiff as not being able to bend, squat, crawl, or climb at all.  Id.  He then went on to state in his opinion, plaintiff would not be able to perform work on a sustained and continual basis (eight hours a day, five days a week).  He explained that decision

by stating "she cannot maintain movement secondary to chronic back pain from degenerative changes in her spine." Id.

Dr. Tidwell noted plaintiff's impairments would interfere with work requiring a persistent pace of production, stating her pain "impair[ed]" her concentration. (R. 202). He also stated he believed plaintiff's conditions would impede her ability to work, and he judged she would be absent more than three days per month. Id.

On September 21, 2007, the ALJ sent plaintiff for more testing. She had views taken of her spine at Hillcrest Medical Center at three levels, at the L5-S1 level, the thoracic spine, and the cervical spine. There was no abnormality of the cervical or thoracic spine, however, degenerative joint disease was noted at the L5-S1 level. Other than that, plaintiff's spine was "unremarkable." (R. 204-206).

On October 15, 2007, plaintiff visited Larry Vaught, Ph.D. for a psychiatric evaluation requested by the ALJ. (R. 207-217). Plaintiff reported resuming treatment she had stopped at Grand Lake Mental Health in a "local clinic in her hometown," and was prescribed Wellbutrin and Elavil (both anti-depressants). (R. 207). Dr. Vaught described plaintiff as making "okay" eye contact, stated her "manner of relating was pleasant, deferential and cooperative," and noted her thinking to be "logical and goal directed with no loosening of associations." (R. 208).

Dr. Vaught administered several standard tests to plaintiff, including the Wechsler Adult Intelligence Scale (WAIS-III) and the Wechsler Memory Scale (WMS-III), scoring 92 and 85 respectively, obtaining an immediate Memory index of 80 and general of 89. (R. 208-209). She obtained a verbal IQ score of 79, performance IQ of 90 and her full scale IQ was 83, "placing her in the 13th percentile." (R. 209). Plaintiff's reading and spelling scores were at a high school level, and arithmetic at a sixth grade level. Id.

10

Plaintiff received scores of 39 and 45 on the Beck Anxiety Inventory and Beck Depression Inventory, respectively, suggesting the possibility of both moderate to severe anxiety and depression.  (R. 211).  Dr. Vaught concluded his report with an Axis diagnosis of Axis I – Major Depressive Disorder, Recurrent, Moderate without Psychotic Features, Axis II – deferred, and Axis III – Pain Disorder, Hypertension (by history).  (R. 212).

Dr. Vaught completed a psychiatric RFC form for plaintiff and found no significant limitations on understanding and memory.  (R. 213).  Only moderate limitations were noted on the following:  the ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and being punctual; the ability to work in close proximity to others without being distracted; the ability to complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace; the ability to interact appropriately with the general public; and the ability to set realistic goals or make plans independently of others.  Everything else was marked "no significant limitation."  (R. 214-215).  Dr. Vaught mentioned plaintiff's memory was mostly low average, consistent with her full scale IQ rating of 83.  (R. 216).  Plaintiff was rated as being able to manage any benefit payments awarded.  (R. 217).

On October 26, 2007, plaintiff was seen by E. Joseph Sutton, II, D.O., for an additional physical agency examination.   (R. 218-231).   Plaintiff's medications were listed as Methocarbamol (750 mg) (helps relieve pain), Darvocet-N 100 (narcotic pain reliever), Elavil (50 mg) (antidepressant), Atenolol (50 mg) (beta-blocker), and Wellbutrin (150 mg) (antidepressant).   (R. 218).   Dr. Sutton noted plaintiff had no gross abnormalities, communication was easy in a normal conversational tone of voice, no masses were found, heart rhythm was regular with no murmurs, gallops or rubs, lungs were clear, and the abdomen was

11

normal, the scar consistent with recent abdominal surgery was noted.  (R. 219).  Dr. Sutton noted

plaintiff's extremities showed normal reflexes bilaterally in both the upper and lower extremities,

and she had a normal range of motion study.  Normal gait, speed and safety were noted through

the office and across the parking lot.  Plaintiff was "in and out of a chair, up and down the step-

stool and on and off the examination table without any difficulty."  (R. 220).  Normal fine motor

coordination was demonstrated by taking out her billfold, operating the billfold's zipper, taking

out a card and reversing the same process.  Plaintiff bent over to pick up her purse from the floor

in one swift motion without any difficulty.  Id.  The range of motion in plaintiff's lower back was

"completely normal which is better than seen by prior examiners," and no tenderness or muscle

spasms were noted in plaintiff's lower back.  Id.  Her straight leg raising test in the sitting and

supine positions was negative, no scoliosis was noted and plaintiff effectively opposed her thumb

and fingertips and grasp a tool.  Id.  Dr. Sutton noted heel to toe walking seemed to create a

balance problem.  Id.  His overall impression was "low back pain, history of tobacco use, history

of abdominal surgery [], a history of syncope which has not been medically evaluated."  Id.

Dr. Sutton enclosed a medical assessment form (RFC) stating in his opinion, plaintiff was

able to sit, stand and walk for one to two hours at a time and six to eight hours during an eight

(8) hour day.  He opined she could never lift and carry 26-100 pounds, could occasionally lift

and carry 11-25 pounds and frequently lift and carry any less than 11 pounds.  Id.  He placed no

restrictions on plaintiff for the use of her feet and hands for repetitive movement.  He stated

plaintiff was able to occasionally bend, squat, crawl, climb and reach, and added she could

perhaps frequently perform these activities.  He placed no environmental restrictions on plaintiff

except unprotected heights because of her "questionable balance."  Id.

Dr. Sutton stated that overall, plaintiff's examination was normal with some balance problems while heel-walking and toe-walking, although she had no weakness when heel and toe walking.  Id.  Plaintiff's range of motion testing all show normal limits with no pain.  (R. 225-228).

## Procedural History

In assessing plaintiff's qualifications for disability and SSI, the ALJ determined at step one of the five step sequential process that plaintiff had not been engaged in substantial gainful activity since March 17, 2005, her alleged onset date.  (R. 16).  At step two, the ALJ found plaintiff to have the severe impairments of back problems, depression, anxiety, numbness in her legs and arms, ear infection, headaches, bruised ribs, and stomach problems.  Id.

At step three, the ALJ determined plaintiff's impairments did not meet the requirements of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  The ALJ discussed physical listing 1.04, disorders of the spine, and determined plaintiff's condition did not meet the required regulations.  (R. 17-18).  He next considered the mental listings of 12.04, Affective Disorders, and 12.06, Anxiety Related Disorders.  He determined plaintiff did not satisfy the requirements of listings 12.04, or 12.06, including the "paragraph B" criteria.  (R. 18-19).  The ALJ weighed the "paragraph C" criteria and found the evidence failed to establish the presence of "paragraph C" criteria.  (R. 19).  The ALJ elaborated on plaintiff's mental limitations, stating plaintiff had only a mild restriction of activities of daily living, and social functioning, moderate difficulties with concentration, persistence or pace and no episodes of decompensation.  (R. 18-19).  In order to meet the "paragraph B" criteria limitations, a claimant's mental impairments

13

must cause a "marked"[8] degree of limitation on the level of functioning in at least two of the four areas of evaluation, activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation. The ALJ explained that plaintiff did not satisfy the "paragraph B" criteria of any mental listing, because her mental impairment did not cause at least two (2) "marked" limitations or one (1) "marked" limitation and "repeated" episodes of decompensation. (R. 19). The ALJ went on to state that the evidence failed to establish the presence of "paragraph C" criteria. She was able to take care of her own basic needs and could function mentally with minimal limitations as a whole daily. Id.

Before moving to the fourth step, the ALJ found plaintiff had the residual functional capacity ("RFC") to perform work as follows:

> … limited to lifting 20 pounds, standing and walking 2 hours out of an 8 hour day at 1 hour intervals, sitting 6 hours out of an 8 hour day at 1 hour intervals, limited crawl and operate foot controls, occasional bend, stoop, crouch, kneel, squat, push pull, and reach overhead. The claimant should avoid rough uneven surfaces, unprotected heights, fast and dangerous machinery and cold. The claimant is further limited to a low noise environment and should avoid telephone work. There is also a slight limitation in the ability to finger feel and grip and she should have easy access to restrooms. Further, the work must be kept simple, repetitive, and routine; and include a slight limitation on contact with the public, coworkers, and supervisors.

(R. 19-20).

At step four, the ALJ determined that plaintiff was unable to perform any past relevant work, and transferability of job skills was therefore not an issue. See 20 C.F.R. §§ 404.1568, 416.968. At step five, the ALJ considered plaintiff's age, education, work experience, and RFC and found there are jobs that exist in significant numbers in the national economy that plaintiff

---

[8] "Marked" is used as a standard for measuring the degree of limitation, and means more than moderate but less than extreme. 20 C.F.R. § 404, Subpt. P, App. 1, Listing 12.00(C), Mental Disorders.

could perform.  See 20 C.F.R. §§ 404.1560(c), 404.1566, 416.960(c) and 416.966.  (R. 23).  The

ALJ elaborated, stating plaintiff's ability to perform sedentary work was limited by additional

limitations.  He discussed testimony from the vocational expert who stated there were sedentary

jobs in the national and regional economies that plaintiff could perform, given her additional

limitations.  The ALJ listed the examples of ticket counter clerk (3,000 in the region and 75,000

in the nation), and clerical mailer (3,000 in the region and 60,000 in the nation).  Id.  The ALJ

determined these numbers to be significant.  The ALJ concluded that plaintiff was not disabled

under the Act from March 17, 2005, through the date of the decision.  (R. 24).

## Review

When applying for disability benefits, a plaintiff bears the initial burden of proving that

he or she is disabled.  42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a).  "Disabled"

under the Social Security Act is defined as the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. §

423(d)(1)(A).  A plaintiff is disabled under the Act only if his or her "physical or mental

impairment or impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).  Social Security

regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. §§

404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the

five steps in detail).  "If a determination can be made at any of the steps that a plaintiff is or is

not disabled, evaluation under a subsequent step is not necessary."  Williams, 844 F.2d at 750.

The role of the court in reviewing a decision of the Commissioner under 42 U.S.C. §

405(g) is limited to determining whether the decision is supported by substantial evidence and

whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards.   Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.   Id.   The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."   Id.   The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner.   See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005).  Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands.   White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## Issues Raised

Plaintiff's allegations of error by the ALJ are as follows:

1. The ALJ interfered with plaintiff's right to due process by denying her counsel the opportunity to complete his cross-examination of the vocational expert;
2. The ALJ failed to perform a proper determination at step 5 of the sequential evaluation process;
3. The ALJ failed to perform a proper analysis of the medical source opinions; and
4. The ALJ failed to perform a proper credibility determination.

## Review of Issues

Plaintiff first alleges the ALJ interfered with her right to due process by denying her counsel the opportunity to complete his cross examination of the vocational expert, alleging the ALJ "cut[] counsel off summarily" and overruled his objection to the vocational expert's previous testimony, thus denying her right to due process.  (Dkt. # 16 at 2).  The Court disagrees.

In reviewing the hearing transcript, it is obvious that the ALJ allowed sufficient cross examination of the vocational expert. (R. 368-374).

The role of cross-examination in a social security disability proceeding is limited. According to the Tenth Circuit:

> "[i]t is well established that a Social Security disability hearing is a nonadversarial proceeding." Id. (quotation omitted); see also, e.g., Heckler v. Campbell, 461 U.S. 458, 471, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983) (Brennan, J., concurring). Claimants have a right to cross-examine vocational experts as a part of procedural due process. See Glass v. Shalala, 43 F.3d 1392, 1396 (10th Cir.1994) (citing Perales, 402 U.S. at 402, 410, 91 S.Ct. 1420). Cross-examination is nevertheless an adversarial procedure. See, e.g., Cooks v. Ward, 165 F.3d 1283, 1296 (10th Cir.1998) (citing United States v. Cronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)), cert. denied, 528 U.S. 834, 120 S.Ct. 94, 145 L.Ed.2d 80 (1999). Social security claimants may be unrepresented or represented by someone who is unfamiliar with social security law. But cross-examining a vocational expert with a publication such as the Dictionary of Occupational Titles is clearly a matter for someone well versed in social security law, not a layman. For these reasons, we believe the role of cross-examination in disability proceedings should remain limited. Cf. Hodge v. West, 155 F.3d 1356, 1362-63 (Fed.Cir.1998) ("In such a beneficial structure [as the nonadversarial system of awarding veterans' benefits] there is no room for such adversarial concepts as cross examination, best evidence rule, hearsay evidence exclusion, or strict adherence to burden of proof." (quotation omitted)).

Haddock v. Apfel, 196 F.3d 1084, 1090-91 (10th Cir. 1999). In addition, the ALJ has full authority, provided by Congress, over the proceedings, "to make rules and regulations and to establish procedures … necessary or appropriate to carry out such provisions, and shall adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder." 42 U.S.C. § 405(a); Richardson v. Perales, 402 U.S. 389, 399-400, 91 S.Ct. 1420 (U.S.Tex. 1971).

Plaintiff's specific protest is that, with respect to the jobs which the vocational expert testified could be performed by her, her attorney was not allowed to ask about the number of

17

those jobs available in Oklahoma versus the region. (Dkt. # 16 at 2). Plaintiff is not entirely

correct. With respect to the job of ticket counter clerk, plaintiff's attorney was allowed to ask

about the number of jobs available in Oklahoma, and the vocational expert testified there were

1,200 such jobs in the state. (R. 371-372). The ALJ only stopped this line of questioning when

plaintiff's attorney began to question the accuracy of the vocational expert's numbers (with

respect to the location of those jobs only) without providing any basis for doing so. (R. 372).

Not allowing plaintiff's attorney to delve into the location of the jobs testified to by the

vocational expert was not error, particularly under these circumstances. (R. 372).

Moreover, even had plaintiff's attorney raised legitimate questions regarding the number

of job located in Oklahoma, the result would not have changed:

> An individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work **which exists in
> the national economy, regardless of whether such work exists in the
> immediate area in which he lives**, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for work. **For purposes of the
> preceding sentence (with respect to any individual), "work which exists in the
> national economy" means work which exists in significant numbers either in
> the region where such individual lives** *or in several regions of the country*.

42 U.S.C. § 423(d)(2)(A) (emphasis added). All of the jobs relied upon by the ALJ exist in a

region that includes Oklahoma.

Finally, plaintiff cites Allen v. Barnhart, 357 F.3d 1140, 1145 (10th Cir. 2004) (citing

Trimiar v. Sullivan, 966 F.2d 1326, 1330 (10th Cir. 1999)), which addresses what "significant

numbers" of jobs really means. In Allen, the Tenth Circuit stated that a job with approximately

650-900 positions available statewide was in a "gray area" which required the ALJ to

specifically address whether those numbers are sufficient. Here, the ALJ determined that the

18

available jobs of "ticket counter clerk, 3,000 in region and 75,000 in nation; and clerical mailer, 3,000 in region and 60,000 in nation" were "a significant number," and the vocational expert testified that 1,200 of the 3,000 jobs (for ticket counter clerk) were in the state of Oklahoma. Thus, the testimony of the vocational expert regarding the number of available jobs was consistent with <u>Allen</u>, since 3,000 jobs in the region, for both positions mentioned, and 1,200 in Oklahoma for the ticket counter clerk, are not in the "gray area" described by the Tenth Circuit.[9]

Next, plaintiff claims the ALJ failed to perform a proper determination at step five of the sequential process by:  (1) failing to determine the number of jobs available in Oklahoma, (2) failing to include all of plaintiff's documented limitations in his hypothetical, (3) failing to provide specific DOT numbers, making the given job categories unspecific, (4) disregarding testimony from the vocational expert regarding plaintiff's GAF scores, (5) disregarding testimony from the vocational expert regarding the RFC determination provided by plaintiff's treating physician, and (6) failing to include a sit/stand option which would "essentially eliminate[] the prolonged sitting required in sedentary work."  (Dkt. # 16 at 3-5).

The undersigned addressed the first issue *supra*.

---

[9] It is not prejudicial, nor is it required by law for the vocational expert to break jobs out of the region by state (even though the vocational expert did so with respect to one job in this case) when the total number of jobs within the region is deemed significant by the ALJ.  The existence of work is determined by the ALJ by the following:

> Work exists in the national economy when there is a significant number of jobs (*in one* or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications. … [I]f work that you can do does exist in the national economy, we will determine that you are not disabled.

20 C.F.R. § 404.1566(b) (emphasis added).

Plaintiff's second issue is without merit.  The ALJ gave detailed limitations in each of the four (4) hypotheticals that were presented to the vocational expert at the hearing, and again in the final RFC used by the ALJ.  (R. 19-20, 361-362, 363-365, 366-367).  The third issue is without merit, because the vocational expert clearly listed specific DOT numbers at the hearing.  (R. 372-373).

Fourth, plaintiff alleges the ALJ disregarded the testimony of the vocational expert with respect to the effect of plaintiff's GAF scores on any future employment.  When questioned at the hearing by plaintiff's attorney whether an individual with a GAF score of 41-45 would be able to maintain employment, the vocational expert testified:

> If that GAF was on a consistent basis.  The GAF were taken from a, for a certain period, I mean from knowledge of them.  So if that person is a consistent score over a period of time then such a person would not be able to maintain employment.  Usually anything 50 or below would preclude employment on a consistent basis.

(R. 370).  There is only one GAF score of 41 listed in plaintiff's treatment records from Grand Lake Mental Health.  (R. 479).  The record does not support a consistent GAF score of "50 or below."   Rather, the record shows that plaintiff's mental health improved while on her medication.  (R. 170).

Fifth, plaintiff claims the ALJ ignored testimony from the vocational expert regarding a RFC form provided by plaintiff's treating physician, Richard Tidwell, M.D.  The ALJ explained the weight given to Dr. Tidwell's report, stating that Dr. Tidwell is not a treating physician since plaintiff had only seen him once and there were major discrepancies between his report of plaintiff's functional capacity and the remainder of the record, including plaintiff's own testimony of her abilities.  (R. 22).  The ALJ explained he imparted "great weight" to the consultative examiners, as both of them personally examined plaintiff, administered detailed

testing, and both also examined the entire record. Id. Since the ALJ concluded that Dr. Tidwell's opinion was not that of a treating source, the ALJ did not need to further explain his reasoning for rejecting Dr. Tidwell's RFC form.

Sixth, plaintiff argues that SSR 83-12 precludes the use of a sit/stand option for sedentary work. (Dkt. # 16 at 5). Plaintiff is incorrect. SSR 83-12 provides that a vocational expert should be consulted for their extended expertise to apply a sit/stand option to specific jobs:

> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)

> There are some jobs in the national economy--typically professional and managerial ones--in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. **In cases of unusual limitation of ability to sit or stand, a VS [vocational specialist] should be consulted to clarify the implications for the occupational base.**

SSR 83-12 at *4 (emphasis added).

Plaintiff next complains the ALJ erred in his evaluation of the treating physician opinion by not applying the Goatcher factors. The relevant portion of Goatcher is as follows:

> The ALJ must give specific, legitimate reasons for disregarding the treating physician's opinion that a claimant is disabled. … In addition, the ALJ must consider the following specific factors to determine what weight to give any medical opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the

treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

Goatcher v. U.S. Dept. of Health & Human Services, 52 F.3d 288, 290.  Here, the ALJ clearly explained his reasoning for not giving weight to Dr. Tidwell's opinion as well as explaining the reasons for the weight he assigned the consultative examiners' reports:

As for the opinion evidence, great weight is given to the consultative reports from October, 2007.  These doctors reviewed all the records within the file and personally tested and evaluated the claimant.  Their reports were written immediately following their examinations.  There is a residual functional capacity (RFC) form completed by Richard Tidwell, M.D. on August 9, 2007.  It appears, from a review of the records, that Dr. Tidwell saw the claimant only once, in July, 2006, at the Christian Medical Clinic of Grand Lake.  Very little weight is given to this report due to the fact that it was completed over a year after this physician saw the patient and Dr. Tidwell is not a treating physician.  There is a considerable amount of difference between this RFC and the ones from the consultative examinations and the State Agency.  Based upon the substantial evidence to the contrary of Dr. Tidwell's opinion and the discrepancy in the claimant's testimony about her abilities and those assessed by Dr. Tidwell, little weight is given to his opinion.

(R. 22).

Finally, the plaintiff states the ALJ failed to perform a proper credibility determination.  The undersigned disagrees.  The ALJ listed several discrepancies between testimony given by plaintiff at the hearing and the record:

At the hearing, the claimant testified that she does drive a few miles each week.  In the consultative examination on October 26, 2007, she stated that she does not drive because she is afraid to drive.  At the psychological evaluation on October 15, 2007, she stated that she does not drive due to occasional blackouts.  Also at that evaluation, the claimant stated that she had a mini-stroke about five months previous to that time.  At the physical consultative examination two weeks later, she stated that she had never had a stroke.  In April, 2007 at the Christian Medical Clinic of Grand Lake, she stated to the doctor only that her left side went numb but was much better the following day (Exhibit 12F, pages 1 and 2).  In addition,

22

she stated that she had chronic balance problems and sometimes passed out. There is no evidence within the records to indicate that this has actually happened. At the physical examination on October 26, 2007, she had problems with the heel and toe walking.  However, the examiner noted the claimant's gait to be safe, stable and of appropriate speed.  This physician also observed the claimant after she left, that she crossed the parking lot in a normal gait and climbed up into a pickup truck on the passenger side in a normal fashion.  Also, her range of motion in the low back was completely normal which is better than seen by prior examiners.  In addition, she was in and out of a chair, up and down the step-stool and on and off the examination table without any difficulty (Exhibit 16F, page 3).

The claimant testified that she uses a cane on a daily basis outside of the house. The hearing was held in August, 2007, and in the consultative examinations in October, 2007; there is no mention of use of a cane, and no statement from the physicians that she had a cane with her.  Due to her complaints of earaches, her treating physician referred her to Richard Allen, D.O., an ear, nose and throat specialist.  The claimant was examined by Dr. Allen on January 9, 2007.  She did have a mild hearing loss, however; Dr. Allen's impression was that her otologia was referred from "TMJ" which was due to worn dentures (Exhibit 11F).  The claimant testified that she went to a dentist and he told her that the ear problems were not caused by her dentures.  There is nothing in the records to substantiate this statement.  She also had electroencephalograph testing done on September 21, 2006, which was normal (Exhibit 8F, page 1).  On October 18, 2006, she was hooked up to a Holter Monitor and the results from this testing was [sic] that no significant abnormalities were noted (Exhibit 8F, pages 3 and 4 and Exhibit 12F, page 1).  These are several troubling discrepancies between the claimant's testimony and her presentation and the objective medical evidence.  Based upon these discrepancies the [A]dministrative Law Judge finds that the claimant's testimony is credible only to the extent that it is consistent with this decision.

…

The claimant stated that she was in constant pain, however; there are no objective findings to support the level of her complaints of the severity of the pain level. All of the electro diagnostic testing has revealed normal or only mild physical findings.  Her physical examinations, other than her subjective complaints, reveal normal or only mild deficits.  Her daily activities are not indicative of someone experiencing disabling pain.  As stated above, the claimant's complaints of pain are determined to be credible only to the extent that they are consistent with this decision.

(R. 21-22).[10]

### Conclusion

The Court finds that the ALJ evaluated the record in accordance with the legal standards established by the Commissioner and the courts.  The Court further finds that there is substantial evidence in the record to support the ALJ's decision.  Accordingly, the decision of the Commissioner finding plaintiff not disabled is hereby AFFIRMED.

SO ORDERED this 27th day of September, 2010.

_____
T. Lane Wilson
United States Magistrate Judge

---

[10] Plaintiff also argues that the ALJ "failed his duty to develop the record by obtaining the dental records."  The burden of proof is on the claimant for social security benefits until the fifth and final step of the five step sequential evaluation process.  42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512, 416.912.  It was plaintiff's responsibility to submit the dental records which she testified conflict with Dr. Allen's evaluation.  Plaintiff failed to do so.